Patricia A. Stamler, MI Bar #P35905
*Pro Hac Vice Admission pending*
pstamler@hertzschram.com
Hertz Schram PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
Tel: (248) 335-5000
Fax: (248) 335-3346

Phillip E. Benson, CA Bar #97420
philbenson@warrenbensonlaw.com
Warren ■ Benson Law Group
620 Newport Center Dr., Ste 1100
Newport Beach, CA 92037
Tel: (952) 955-3688
Fax: (858) 454-5878

*Attorneys for Relator TDP RCM Services*

FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

2/7/20

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY
CS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel*. TDP RCM SERVICES, LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>DR. JOEL ARONOWITZ, DANIEL ARONOWITZ, SARAH ARONOWITZ, TOWER MULTI-SPECIALTY MEDICAL GROUP, TOWER OUTPATIENT SURGERY CENTER, TOWER WOUND CARE OF SANTA MONICA, and TOWER MEDICAL BILLING SOLUTIONS, Jointly and Severally,<br><br>    Defendants. | Case No.   CV20-1248-JFW(PLAx)<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2) AND CAL. GOV. CODE § 12652(C)(2)]** |

Plaintiff-Relator, TDP RCM Services, LLC (hereafter "TDP" or "Relator"), on behalf of itself, the United States of America, and the State of California, by and through its attorneys, states the following for its Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*; the Fraud Enforcement Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729–3733; and the California False Claims Act, Cal. Gov. Code §12650 *et seq.* ("CFCA") (collectively, the "Acts"):

## INTRODUCTION

1.    Chronic wounds of the lower extremities, including venous stasis ulcers, diabetic foot ulcers and pressure sores, constitute a major public health problem. While lower extremity ulcers have numerous causes such as burns, trauma, mixed venous-arterial disease, immobility and vasculitis, nutritional or other neuropathy, over 90% of the lesions in the United States are related to venous stasis disease and diabetic neuropathy.

2.    Standard treatment of lower extremity ulcers (e.g., diabetic foot ulcers (DFU) and/or venous leg ulcers (VLU)) may include mechanical offloading, infection control, mechanical compression, limb elevation, debridement of necrotic tissue, management of systemic disease and counseling on the risk of continued tobacco use. In addition, maintenance of a moist wound environment through appropriate dressings facilitates development of healthy granulation tissue and epithelialization and thus may lead to complete healing at a wound site. Dressings are an integral part of wound management by not only maintaining a moist environment but by stopping contamination and absorbing exudate.

3.    Despite advancements in various synthetic occlusive dressings some ulcers fail to heal so other adjuncts to wound care such as the development of skin substitutes have been used to increase success rates of healing.

4.    This case centers on submission of false claims by billing for biologic (skin substitutes) under the place of service code for an office setting and billing the application of the biologic under the code for ambulatory surgical center, thereby

double billing resulting in significant losses to the federal fisc and the State of California fisc.

### JURISDICTION AND VENUE

5.      This action arises under the Acts of the United States of America and the State of California to recover treble damages and civil penalties on behalf of the United States of America and the State of California arising out of Defendants' submission of false claims to the United States and the State of California Governments through the federal Medicare and the federal and state Medicaid program.

6.      31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal FCA and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under the FCA. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732. This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to the CMPL, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the FCA which provides that "any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred." The acts that are the subject of this action, occurred in this judicial district.

8.      As required under § 3730(b)(2) of the FCA, Relator provided to the Attorney General of the United States and to the United States Attorney for the

Central District of California, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Evidentiary Disclosure"). Relator has also provided the Attorney General of the State of California a copy of the Evidentiary Disclosure pursuant to Cal. Gov. Code §12652(3).

9.     Relator is the original source of the information of the allegations contained in this Complaint.

**THE PARTIES**

10.     TDP is an Arizona limited liability company that conducts business in the Central District of California.

11.     Dr. Joel Aronowitz ("Aronowitz") is an individual who works and resides in the Central District of California.

12.     Daniel Aronowitz is an individual who works and resides in the Central District of California.

13.     Sarah Aronowitz is an individual who works and resides in the Central District of California.

14.     Upon information and belief, Tower Multi-Specialty Group is a California medical corporation that conducts business and has a registered office in the Central District of California.

15.     Tower Outpatient Surgery Center is a California corporation that conducts business and has a registered office in the Central District of California.

16.     Tower Wound Care of Santa Monica is a California corporation that conducts business and has a registered office in the Central District of California.

17.     Tower Medical Billing Solutions is a California corporation that conducts business and has a registered office in the Central District of California.

**GENERAL ALLEGATIONS**

18.     TDP is a leading nationwide provider of outsourced revenue cycle and business process solutions.

19.     TDP partners with medical billing companies and healthcare service organizations to assist them in maximizing their own service offerings and outcomes for the physicians and hospital networks they serve.

20.     TDP is the fulfillment entity that meets the contract needs of its clients.

21.     TDP's "Leadership and Operations Management Team comprise over 100+ years of medical billing, healthcare finance and administration experience." https://www.tdprcm.com/about-tdp/ (last visited on January 30, 2020).

22.     Per TDP's website regarding medical coding, TDP notes that its "deep experience has taught us that even the best processes can be weakened by bad data.

23.     A medical claim is only as good as its charges are accurate.

24.     For physicians and hospitals outsourcing their revenue cycle management process, medical coding services drive value and results to bottom-line financial performance." https://www.tdprcm.com/medical-coding/ (last visited on January 30, 2020).

25.     Further, TDP has more than 150 coding specialists employed with experience spanning nearly 30 medical specialties. *Id.*

26.     This qui tam case is focused on TDP's former clients Defendants Aronowitz, the Tower Multi-Specialty Medical Group, Tower Outpatient Surgery Center, Tower Wound Care of Santa Monica, and Tower Medical Billing Solutions, and Aronowitz's two children, Daniel Aronowitz and Sarah Aronowitz, who work with him.

27.     Aronowitz's website states that he is a plastic surgeon located in Beverly Hills, Los Angeles, California. https://www.aronowitzmd.com/. (last visited January 30, 2020).

28.     Aronowitz specializes in several cosmetic procedures including scar removal, thigh lifts, face lifts, tummy tucks, and breast augmentations.  *Id.* Aronowitz incorporates "stem cell treatments into his procedures to provide his patients with the best possible experience." *Id.*

29.     Aronowitz "emphasizes using the body's own tissues and healing processes to regenerate damaged areas." *Id.*  Aronowitz's practice encompasses most areas of cosmetic and reconstructive plastic surgery including breast surgery, facelift, and revision surgery. *Id.*

30.     Further, "[i]n his free time, Dr. Aronowitz is a regular on the local tennis courts, though not much of a threat to the neighborhood competition. Dr. Aronowitz and his wife of 35 years are involved in local schools and museums; they enjoy traveling the globe together." *Id.*

31.     Banc of California featured Aronowitz as one of its leading business owners, entrepreneurs and community leaders the bank partners with to "empower their California dreams and strengthen the economy." https://bancofcal.com/about-us-profile/company-profile/featured-clients-partners/dr-joel-aronowitz/ (last visited on January 30, 2020).

32.     Further,

Aronowitz has been banking with Banc of California for over 15 years. Looking for a more personalized approach to his banking needs, Dr. Aronowitz wanted a bank that would give him courage to expand his business, and comfort knowing his bank would act as a partner in his growth. 'What attracted me to the bank to begin with was having been a small fish in a big pond—I wanted to be a bigger fish in a smaller pond. But the danger of that is that you don't want a pond that's too small. Banc of California was the right size, and it's still the right size. Banc of California has grown as I've grown.'

*Id.*

33.     Aronowitz is the owner of several entities: 1) Tower Multi-Specialty Medical Group, which is a physician office, located at *8635 W. 3rd Street, Suite 1090W, Los Angeles, CA*; 2) Tower Outpatient Surgery Center (ASC #1), which is an

ambulatory surgery center located at *8635 W. 3rd Street, Suite 1085 W, Los Angeles, CA*, and 3) Tower Wound Care of Santa Monica (ASC #2), which is an ambulatory surgery center located at1 301 20th Street, Suite 470 Santa Monica, CA 90404 (collectively, "Tower") (italicized for emphasis).

34.    In addition to its Los Angeles and Santa Monica, Tower has other locations in California:  Encino, Culver City, Lynwood and Pasadena.

35.    Tower's Multi Specialty Medical group's NPI number is 1992071476; its Medicare Provider Transaction Access Number ("PTAN") is GD011A and its Tax ID number is 45-4497054.

36.    Tower's Physician Office Setting-Tower Outpatient Surgery Center's NPI number is 1669687513, its PTAN is S051274A and its Tax ID number is 95-4809361.

37.    Tower's Ambulatory Surgery Center-Tower Wound Care Center of Santa Monica's NPI number is 1609104900, its PTAN is F1132 and its Tax ID number is 27-1194765– Ambulatory Surgery Center.

38.    Daniel Aronowitz is the President of Tower Medical Billing Solutions which is located at 8635 W. 3rd Street, Los Angeles, CA  90048. https://www.towermedicalbilling.com (last visited January 30, 2020).

39.    According to its website, Tower Medical Billing Solutions provides doctors with an "RCM company that can serve them as a trusted advisor and business partner.  More than just providing billing, coding, and regulatory compliance, Tower works with you to create a strong business infrastructure that you can grow your practice on."  *Id.*

40.    Tower Medical Billing Solutions touts its specialty focus as "exclusively with Podiatry, Dermatology, and Wound Care practices."  *Id.*

### CODING AND BILLING FOR WOUND CARE

*41.*    The Local Coverage Determination ("LCD") governing skin substitutes addresses the reasonable and necessary ("R & N") threshold for coverage of skin

replacement surgery with an emphasis on the indications for application of skin substitute grafts for diabetic foot ulcers and venous leg ulcers. *Id.*

42.   Additionally,

[s]tandard treatment of lower extremity ulcers…may include mechanical offloading, infection control, mechanical compression, limb elevation, debridement of necrotic tissue, management of systemic disease and counseling on the risk of continued tobacco use.

### FDA REGULATION

43.   Typically, the Food and Drug Administration ("FDA") regulates skin substitutes by the premarket approval ("PMA") process, FDA 510(k) premarket notice process, or the FDA regulations for human cells, tissues, and related cellular and tissue-based products, and via FDA's humanitarian device exemption process.

44.   Medicare deems skin substitutes as surgical supplies or devices.  But, there are occasions where certain products might have a wound healing indication, but may not meet the definition of skin substitutes and similar products that aid wound healing.  FDA's classification and indication is not the sole basis for determining if a product is defined as a skin substitute and/or satisfies the definition of reasonable and necessary to be covered."

45.   According to the governing Current Procedural Terminology (CPT), when skin replacement surgery occurs in the office, routine dressing supplies are not reported separately. This includes the application of non-autologous human skin (e.g., homograft, allograft), non-human skin substitute grafts (ie. xenograft), and biological products that form a sheet scaffolding for skin growth. These procedures must not be billed for application of non-graft wound dressings (eg, gel, ointment, foam, liquid) or injected skin substitutes. The removal of a current graft and/or simple cleansing of the wound is included, when performed. Non-graft wound dressings are generally included in standard wound care management. The application of skin substitute

grafts (CPT codes 15271-15278) is distinguished based upon the location of the wound and surface area, rather than the description of the product.

### CHRONIC WOUND CARE

46.     When wounds do not respond to initial therapy or persist after additional care they are considered chronic. Where a wound has failed to heal within one to three months of treatment it may be deemed chronic and thus, "the use of a skin substitute graft, which is an advance treatment method, may be used for certain patients."

47.     Further, it is expected that a certain skin substitute graft product will be used for 12 weeks following the first application of it so long as its use does not conflict with FDA's requirement and/or the American Association of Tissue Banks (AATB) approved use and/or the applicable CPT.  Further, to "[r]epeat an application of a skin substitute graft within the 12-week episode following surgery for wound care, may be considered upon a re-assessment and support in the medical record.

48.     Medicare coverage for continuing wound care for a specific wound is dependent upon documentation in the patient's medical record reflecting the wound is improving in response to the specific wound care. It is not reasonable or medically necessary to continue a given type of wound care if evidence of wound improvement cannot be clearly demonstrated as documented in the medical record.

### CPT CODES 15002-15005-SKIN REPLACEMENT

49.     Per the CPT Code Book CPT codes 15002 through 15005 are not appropriate codes to use when performing a non-surgical application of a skin substitute.  These codes are appropriately used where the place of service is an inpatient hospital, outpatient hospital or ambulatory surgical center with regional or general anesthesia to resurface an area damaged by burns, traumatic injury or surgery. In order to bill under these CPT codes, an operative report is required and must be available upon request.

### CODING GUIDELINES

50.     Where active wound care is provided with minimal anesthesia it is billed with either CPT code 97597 or 97598.

51.     Where significant debridement of a wound is done prior to the application of a topical or local anesthesia, this service is billed with CPT codes 11042 – 11047.

52.     Where skin replacement service is an inpatient hospital, outpatient hospital or ambulatory care center (ASC) CPT codes 11043, 11046, 11044, and 11047 are typically billed.

53.     CPT codes 15271 – 15278 are used to bill for the surgical preparation or the creation of a recipient site for the tissue skin graft.

54.     CPT codes 15002/15005 are not appropriate codes to use when performing a non-surgical application of a skin substitute. Rather, CPT codes 15002/15005 are only appropriate where the service is performed at an inpatient hospital, outpatient hospital or ambulatory surgical center with regional or general anesthesia to resurface an area damaged by burns, traumatic injury or surgery. An operative report is required and must be available upon request.

55.     CPT codes 15400-15431 are used for the service of the application of a non-human skin graft or biologic wound dressing ("BWD") (e.g. porcine tissue or pigskin) to a part of the recipient's body following debridement of a burn wound or area of traumatic injury, soft tissue infection and/or tissue necrosis, or surgery.  When this service is provided in the place of service of an office, both the application of the skin graft (CPT codes 15430 - 15431) and the product used must be billed on the same claim. https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/30135_24/gsurg052_cbg.pdf (last visited on January 30, 2020).

56.     The BWD service has a 90-day global period under the Medicare Fee Schedule Data Base (MFSDB).  Thus, Medicare will not pay more frequently than at 90-day intervals. Wound care done within the 90-day period is considered part of the

surgical procedure.   Further, codes 15430-15431 may not be billed with a modifier 58 (staged procedure). *Id.*

57.    CPT code 15431 always relates to CPT code 15430.

58.    The following products of 15430-15431 Q4102 Skin Substitute, Oasis wound Matrix, per square centimeter Q4110 Skin substitute, primatrix, per square centimeter may be billed with CPT codes 15430-15431.

59.    CPT codes 15340-15341 or CPT codes 15360-15366 are used to bill for the surgical preparation or creation of recipient site for the tissue skin graft. In order to bill for an Apligraf® (HCPCS Q4101) package (equal to 44-sq. cm.) and where more than 44-sq. cm. is needed for additional grafting, billing is done according to the number of single units of Apligraf®. *Id.*  The payment for Apligraf® for any single ulcer will not be made for re-treatment within one year after the initial treatment. *Id.*  Dermagraft® (HCPCS Q4106). *Id.*

60.    Skin substitute claims should be billed by the actual size used rounding up to the next whole number. *Id.*

61.    The FDA classifies products like Integra as a wound dressing and are thus not payable separately by Medicare Part B for outpatient services. *Id.*

62.    The application of Integra or similar FDA classified products may be payable as an inpatient service for its FDA approved indication for treating life-threatening full-thickness or deep partial-thickness burns. *Id.*

63.    The application of the Oasis® Wound Matrix (CPT code 15430 - 15431) will be paid only at 90-day intervals. It is inappropriate to bill application codes multiple times within a 90-day period using such modifiers as 58, suggesting a staged procedure. https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/30135_24/gsurg052_cbg.pdf. (last visited on January 30, 2020).

**PASS-THROUGH**

64.     Medicare has items and products that "pass-through" payment for a limited amount of time such as pass-through drugs and biologicals.

65.     The regulations for pass-through drugs/biologicals can be found in 42 C.F.R. § 419.64 and are summarized in the annual Outpatient Prospective Payment System (OPPS) rule.  In January 2018 CMS updated MM10417 pertaining to submission of claims to Medicare Administrative Contractors ("MACs") for services provided to Medicare beneficiaries and paid under the OPPS. https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM10417.pdf. (last visited January 30, 2020).

66.     Section 1833(t)(6)(B) of the Social Security Act ("SSA") governs, under the OPPS, categories of devices be eligible for transitional pass-through payments for at least two, but not more than three years.

67.     The SSA at Section 1833(t)(6)(B)(ii)(IV) required that the CMS create additional categories for transitional pass-through payment of new medical devices not described by existing or previously existing categories of devices. https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM10417.pdf. (last visited January 30, 2020).

68.     Effective January 1, 2018, newly approved biosimilar biological products with a common reference product will no longer be grouped into the same billing code with other biosimilars.

69.     CMS notified providers that it will issue guidance on coding, including instructions for new codes for biosimilars that are currently grouped into a common payment code and the use of modifiers separate from CR10417.

70.     CMS advised providers that until this guidance was released, providers should continue to use applicable existing HCPCS codes and report a biosimilar modifier that identifies the manufacturer of the specific product. The modifier does not

affect payment determination, but it is used to distinguish between biosimilar products that appear in the same HCPCS code, but are made by different manufacturers.

71.     A list of the biosimilar biological product HCPCS codes and modifiers is available on the CMS website at https://www.cms.gov/Medicare/Medicare-Fee-forService-Part-B-Drugs/McrPartBDrugAvgSalesPrice/Part-B-Biosimilar-Biological-ProductPayment.html (last visited January 30, 2020).

72.     Skin Substitute Procedure Edits- The payment for skin substitute products that do not qualify for pass-through status will be bundled into the payment for the associated skin substitute application procedure.

73.     A product when approved as Pass-Through gets separately billed in addition to Application of Skin Substitute.

### DETAIL OF FRAUD SCHEMES

74.     TDP provided medical billing services for Tower for approximately four years.

75.     The last contract between TDP and Tower was a two-year agreement that ended on August 31, 2018.

76.     On July 30, 2018 and July 31, 2018, TDP informed Tower that certain billing practices were illegal and TDP refused to implement the illegal billing practices.

77.     On or about mid-August 2018, Tower, through Daniel Aronowitz, notified TDP for the first time that it would not renew its billing services agreement with TDP.

78.     Tower's notice on or about mid-August 2018, was the first indication to TDP that the parties would not renew their agreement. TDP billed Tower's claims until August 31, 2018.

79.     Tower engaged in three illegal schemes: Scheme #1: Tower billed for biologic using the office place of service (POS) code, and it billed the application of the biologic as POS ambulatory surgical center (ASC); Scheme #2: Tower billed for

the biologic and application of biological in both the office and the ASC (i.e., double-billed both codes); and Scheme #3: Tower changed the product provided to patient in violation of rule that you cannot change from one product to another within the 12-week episode of care.

80.     As noted above, the law mandates that biologic and the application of the biologic must be billed in the same setting.

81.     Tower falsely billed both the biologic and application of the biologic to inflate billing charges.

82.     For example, at the time Tower rendered services in Scheme #1, the biologic was treated as a "pass-through" code in the ASC. Specifically, Epifix was used from January 2018 through September 2018 and at that time it was a Non-Pass through. PuraPly was the only skin substitute which had Pass-Through status in 2015 to 2017 and regained its status in October 2018 until December 2020.

83.     Pass-Through means that the provider does not receive additional reimbursement beyond the fees for the application code when performing this service in the ASC.  Reimbursement of the biologic when it is being applied in the physician's office (where the application code is less than in the ASC), allowed Tower to receive reimbursement above and beyond what it was supposed to receive by performing the service in ASC but falsely billed it as a service performed in the physician's office. Put another way, the biologic is basically bundled into the application fees in the ASC charges.  Billing it with a different POS code was done to obtain additional reimbursement.

### FALSE CLAIMS

**a.  Scheme 1: Illegal Billing for September 2018 Service Dates**

84.     Tower Multi-Specialty Medical Group used EPIFIX (Skin Graft from MIMEDX GROUP INC) (HCPCSQ4131) with the majority of its patients during the period of January 2018 through September 2018.

85.     Tower Multi-Specialty Medical Group applied the skin graft EPIFIX on wounds such as Diabetic Foot Ulcers, Venous Leg Ulcers etc. while the patient was seen in the office setting.

86.     Per CMS billing guidelines (detailed above), physician should use CPT codes 15271/15271/15273/15274/15275 (Application of Skin Substitutes) in conjunction with EPIFIX Q4131 (Skin Substitute) using Place of Service code-11.

87.     Prior to August 31, 2018, the physician group billed charges for service dates under CPT codes 15271/15271/15273/15274/15275 with the POS of code of 11.

88.     Tower and the Aronowitzs were aware that HCPCS Q4131 was a non-pass through skin substitute and is bundled as part of the billing for the application of the material, when the skin graft is applied in the Ambulatory Surgery Center ("ASC") setting. However, Tower and the Aronowitzs falsely billed these ASC services as though the patients were treated in the office setting.

89.     For majority or all of the patients Tower treated in September 2018 for wound care cases, the Tower Outpatient Surgery Center, Tower Wound Care Santa Monica practice intentionally billed the application of skin substitute CPT's 15271/15272/15273/15274/15275 in the ASC setting while billing the Skin Substitute HCPCS Q4131 in the office setting.  This billing procedure resulted in the illegal unbundling of bundled charges to increase the overall billing by submitting claims for payment for both the ASC and OS charges.

90.     Tower used the ASCs to bill CPT's 15271/15272/15273/15274/15275 which had the Medicare allowable billing rate of $930.63. In addition, the Tower used its Tower Multi Physician Group to bill Q4131 which had allowable billing rate of $160.62/Unit. The TOWER MULTI-SPECIALTY MEDICAL GROUP Practice used 4 x 4.5 mesh _Epifix_ (Mimedx Inc) which is approved to be billed at 11 units. Medicare's allowable billing rate for HCPCS Q4131 – 11 units was $1,766.86 during this period.

91.     However, the law mandates that the TOWER MULTI-SPECIALTY MEDICAL GROUP practice should have billed and received reimbursement on each case as follows:

- CPT 15271 along with Q4131-11 units in Office Setting – Allowable of $160.03 plus $1766.86 respectively.
- CPT 15275 along with Q4131-11 units in Office Setting – Allowable of $168.74 plus $1766.86 respectively.

However, Tower billed for services and got paid as follows:

- CPT 15271 along with Q4131 – 11 Units:

    Tower Multi Specialty Medical group – CPT 15271 using place of service 24 and HCPCS Q4131 using place of service 11. Allowable payment of $92.24 plus $1766.86 respectively.

    Tower Outpatient Surgery Center – CPT 15271 using place of service 24. Allowable was $930.63 for this procedure.

    Tower Wound Care Center of Santa Monica - CPT 15271 using place of service 24. Allowable was $930.63 for this procedure.

- CPT 15275 along Q4131 – 11 Units:

    Tower Multi Specialty Medical group – CPT 15275 using place of service 24 and HCPCS Q4131 using place of service 11. Allowable of $104.76 plus $1766.86 respectively.

    Tower Outpatient Surgery Center – CPT 15275 using place of service 24. Allowable was $930.63 for this procedure.

Tower Wound Care Center of Santa Monica - CPT
15275 using place of service 24. Allowable was
$930.63 for this procedure.

92.     On each visit billed during September 2018, Tower knowingly falsely billed Medicare $930.63 resulting in increased revenue. Relator's review of Tower's billing records for Tower Outpatient Surgery Center – NPI 1669687513; Tower's Ambulatory Surgery Center and Tower Wound Care Center of Santa Monica - NPI 1609104900; and Tower's Multi-Specialty Medical Group – NPI 1992071476, at least 200 at $930.63 visits were falsely billed to Medicare for an amount of $186,126.00 for a single month.

**b.  Scheme #2: False Billing for October 2018 till March 2019 Service Dates**

93.     Entities Involved in the False Claims Scheme:

- *Tower Multi Specialty Medical Group* - NPI 1992071476 (PTAN GD011A) (Tax ID 45-4497054) – Physician Office Setting
- *Tower Outpatient Surgery Center* – NPI 1669687513 (PTAN S051274A) (Tax ID 95-4809361) – Ambulatory Surgery Center
- *Tower Wound Care Center of Santa Monica* - NPI 1609104900 (PTAN F1132) (Tax ID 27-1194765) – Ambulatory Surgery Center

94.     Relator observed billing records for October 2018 until March 2019 for Tower Multi-Specialty Medical Group ("TMMG").

95.     Relator observed that TMMG used PuraPly, a skin graft biologic from Organogensis Holdings, on most of its patients.

96.     TMMG applied the skin graft PuraPly on wounds such as diabetic foot ulcers, venous leg ulcers, etc.

97. TMMG illegally used HCPCS Q4172 as a billing code, knowing this was a Pass-Through skin substitute effective October 1, 2018.

98. Based on its Pass-Through status, the billing of the application of PuraPly is supposed to be paid separately with the application only if the skin graft is used in the ambulatory surgery center setting.

99. In 2016 and 2017, TMMG used PuraPly as a graft until it had the Pass-Through status privilege on or about December 2017.

100. TMMG then began using EPIFIX (Skin Graft from MIMEDX GROUP INC) on most of its patients during the period of January 2018 through September 2018.

101. TMMG applied the skin graft EPIFIX on wounds such as Diabetic Foot Ulcers, Venous Leg Ulcers etc.

102. Dr. Joel Aronowitz owns Ambulatory Surgery Centers - Tower Outpatient Surgery Center along with Tower Wound Care Center of Santa Monica.

103. TMMG was well aware how to bill for the Pass-Through Codes in ASC setting. For majority or all of the patients seen from October 2018 until December 31, 2018, TMMG knowingly falsely billed skin graft PuraPly Q4172 and from at least January 1, 2019 through March 2019, Q4195 – PuraPly and Q4196 - PuraPly AM as applied to patients in both Office Setting and ASC setting.

104. In 2018, the practice used the ASC code to bill HCPCS PuraPly Q4172 – Allowable of $120.78 per Unit. The practice used the Office Setting code to bill HCPCS PuraPly Q4172 – Allowable of $71.20 per Unit.

105. In 2019, the practice used the ASC code to bill HCPCS PuraPly Q4195 – Allowable of $120.78 per Unit. The practice used the ASC code to bill HCPCS PuraPly Q4196 – Allowable of $120.78 per Unit. The practice used the Office Setting code to bill HCPCS PuraPly Q4195 – Allowable of $75.868 per Unit. The practice used the Office Setting code to bill HCPCS PuraPly Q4196 – Allowable of $59.807 per Unit.

106.   Contrary to Defendants' illegal billing practices, the law mandated that the physician practice and ASC should have billed and was paid as below on each visit for a patient.

107.   For 2018, CPT 15271 in Office Setting (TOWER MULTI-SPECIALTY MEDICAL GROUP) – Allowable of $92.24 (# - These amounts apply when service is performed in a facility setting.)  For 2018, CPT 15271 along with Q4172 in ASC Setting – Allowable of $930.63 and $120.78 (1 unit) respectively.

108.   For 2018, CPT 15275 in Office Setting (TOWER MULTI-SPECIALTY MEDICAL GROUP) – Allowable of $104.76 (# - These amounts apply when service is performed in a facility setting.)  For 2018, CPT 15275 along with Q4172 in ASC Setting – Allowable of $930.63 and $120.78 (1 unit) respectively.

109.   For 2019, CPT 15271 in Office Setting (TOWER MULTI-SPECIALTY MEDICAL GROUP) – Allowable of $91.91 (# - These amounts apply when service is performed in a facility setting.)  For 2019, CPT 15271 along with Q4195/Q4196 in ASC Setting – Allowable of $919.81 and $120.78 (1 unit) respectively.  For 2019, CPT 15275 in Office Setting (TOWER MULTI-SPECIALTY MEDICAL GROUP) – Allowable of $104.45 (# - These amounts apply when service is performed in a facility setting.)  For 2019, CPT 15275 along with Q4195/Q4196 in ASC Setting – Allowable of $919.81 and $120.78 (1 unit) respectively.

110.   In violation of the law, the practice billed and was paid as set forth below:

CPT 15271/15275 along Q4172 in 2018 and CPT 15271/15275 along with Q4195/Q4196 in 2019 in both Physician Office and Ambulatory Surgery Center. Thus, approximately 36,000 units of PuraPly were billed inappropriately in Physician Office setting (TOWER MULTI-SPECIALTY MEDICAL GROUP).

111.   As of March 31, 2019, about 15,000 units of PuraPly were entered in system and yet to be billed.

112.   Single damages for October 2018 through March 31, 2019 are approximately $2.5 million and could well exceed $3 million, which should not have billed and paid.

## COUNT I

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

113.   Relator incorporates by reference the preceding allegations in Paragraphs 1 through 112 inclusive.

114.   This is a claim for treble damages and civil penalties against Defendant under the FCA, 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and/or, pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii), to California Medicaid.

115.   Defendants have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented false or fraudulent claims to the Medicare program for payment for services that were to be furnished to Medicare beneficiaries but were not provided in conformity with Federal and California requirements.

116.   Defendants have also violated 31 U.S.C. § 3729(a)(1)(A) because as part of the alleged fraudulent conduct, Defendants knowingly presented false or fraudulent claims, or caused false or fraudulent claims to be presented, to California Medicaid for payment for required services that were to be furnished to California Medicaid beneficiaries but were not provided in conformity with Federal and California requirements. Defendants thereby also caused California Medicaid to submit false claims to the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(A). Defendants likewise violated 31 U.S.C. § 3729(a)(1)(A) because through these acts they knowingly presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or fraudulent claims to California Medicaid (a grantee and/or recipient of United States funds) for payment

for services that were to be furnished to California Medicaid beneficiaries but were not provided in compliance with Federal and California requirements.

117.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**COUNT II**

**FEDERAL FALSE CLAIMS ACT**

**31 U.S.C. § 3729(a)(1)(B)**

118.   Relator incorporates by reference the preceding allegations in Paragraphs 1 through 117 inclusive.

119.   This is a claim for treble damages and civil penalties against Defendants under the FCA, 31 U.S.C. § 3729(a)(1)(B), for knowingly making, using, or causing to be made or used, a false record or statement material to false or fraudulent claims paid or approved by the United States and/or, pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii), to California Medicaid.

120.   As described in the allegations above regarding Defendants' schemes, Defendants have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to claims for payment paid by the Medicare program for services that were to be furnished to Medicare beneficiaries but were not provided in compliance with Federal and California requirements.

121.   Defendants also violated 31 U.S.C. § 3729(a)(1)(B) because as part of the alleged fraudulent conduct Defendants knowingly made, used, or caused to be made or used, a false record or statement material to false or fraudulent claims paid or approved by California Medicaid. Defendants thereby also caused California Medicaid to make or use false records or statements material to false or fraudulent claims paid by the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. §

3729(a)(1)(B). Defendants likewise violated 31 U.S.C. § 3729(a)(1)(B) because through these acts they knowingly presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or fraudulent claims to California Medicaid (a grantee and/or recipient of United States funds) for payment for required nursing facility services that were to be furnished to California Medicaid beneficiaries but were not provided in compliance with Federal and California requirements.

122.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT III

## CALIFORNIA FALSE CLAIMS ACT

123.   Relator incorporates by reference the preceding allegations in Paragraphs 1 through 122 inclusive.

124.   By virtue of the above-described acts, among others, Defendants have knowingly submitted, and continues to submit, directly or indirectly, to officers, employees or agents of the State of California, false MediCal (California Medicaid) claims for payment or approval for services in violation of the California False Claims Act, Cal. Gov. Code §12650 *et seq.*

125.   Defendants' submission of false claims to the State of California caused it to suffer and continue to suffer monetary damages in an amount to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Relator demands that judgment be entered in favor of the United States and the State of California and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This request includes, with respect to California, three times the amount of damages to the State, plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim submitted, and any other recoveries or relief provided for

under the California Medicaid FCA. This request also includes, with respect to the United States, three times the amount of damages to the United States, plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim submitted on or before November 2, 2015 and civil penalties of no more than $22,363 and no less than $11,181 for each false claim submitted on or after November 3, 2015, and any other recoveries or relief provided for under the Federal FCA.

Further, Relator requests that it receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by California and the United States plus reasonable expenses necessarily incurred and reasonable attorneys' fees and costs. Relator requests that its award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

Respectfully submitted,

Warren ■ Benson Law Group

By:

Phillip E. Benson, CA Bar #97420
philbenson@warrenbensonlaw.com
620 Newport Center Dr., Ste 1100
Newport Beach, CA 92037
Tel: (952) 955-3688
Fax: (858) 454-5878

Patricia A. Stamler, MI Bar #P35905
*Pro Hac Vice Admission pending*
pstamler@hertzschram.com
Hertz Schram PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
Tel: (248) 335-5000
Fax: (248) 335-3346

Complaint

1

### DEMAND FOR TRIAL BY JURY

2

Relator, on behalf of itself, the United States of America, and the State of

3

California, by and through its attorneys, hereby demands a jury trial in the above-

4

captioned matter.

5

Respectfully submitted,

6

Warren ■ Benson Law Group

7

8

By:

9

Phillip E. Benson, CA Bar #97420
philbenson@warrenbensonlaw.com

10

620 Newport Center Dr., Ste 1100
Newport Beach, CA 92037
Tel: (952) 955-3688

11

Fax: (858) 454-5878

12

13

Patricia A. Stamler, MI Bar #P35905
*Pro Hac Vice Admission pending*
pstamler@hertzschram.com

14

Hertz Schram PC
1760 S. Telegraph Road, Suite 300

15

Bloomfield Hills, MI  48302
Tel: (248) 335-5000

16

Fax: (248) 335-3346

17

18

19

20

21

22

23

24

25

26

27

28

Complaint